L. H. DUNN ET AL V. DUVAL TEXAS SULPHUR COMPANY ET AL.

No. 7625.   Decided June 4, 1941.
Rehearing overruled July 9, 1941.
(152 S. W., 2d Series, 1080.)

*Walter F. Brown*, of Houston, for appellant.

*Vinson, Elkins, Weems & Francis*, for the Duval Texas Sulphur Company, *Ike S. Handy*, for Federal Royalty Company and *Margaret Averill*, all of Houston, and *E. Hawees*, of Wharton, for Davidek and Cloud, all appellees.

MR. JUDGE HICKMAN of the Commission of Appeals delivered the opinion for the Court.

This case is before us on certificate from the Honorable Court of Civil Appeals, First District, at Galveston. By the questions submitted in the certificate we are called upon to construe a certain phase of a written contract. It is disclosed in the tentative opinion accompanying the certificate that in the summer of 1932 it was agreed between appellant Dunn and appellee Duval Company that the former and his associates, all of whom will be hereinafter designated as Dunn, should endeavor to assemble a block of mineral leases on what is known as the Boling Sulphur Dome in Wharton County, for which services he was to be compensated by the Duval Company. Thereafter, on December 22, 1932, Dunn assigned to the Duval Company the leases which he had secured up to that date, and the parties reduced their verbal agreement to writing. Later that contract was amended in the particulars hereinafter shown, and we are called upon to construe that portion thereof to which the amendment related.

Paragraph 4, subsection (d) of the contract reads as follows:

"(d) First Party shall be entitled to receive an overriding royalty of One Dollar ($1.00) per long ton on Sulphur produced and saved from any of the above described leased premises or mineral interests, and from any other leases or min-

,eral interests acquired by Second Party in said contract area, which shall be paid to him in the same manner as the land owner's royalty, and which overriding royalty interest shall be vested in First Party by proper terms of conveyance from Second Party to First Party. It is agreed, however, that said overriding royalty interest is based on the full one hundred per cent. ownership of the sulphur interest in the various tracts of land in said contract area, and in case the interest in any specific tract of land assigned to Second Party by First Party plus any interest therein acquired by Second Party shall be less than one hundred per cent. of the sulphur rights therein, then First Party's overriding royalty interest payable on the sulphur produced and saved from said tract shall be reduced and shall be determined in the following manner: The sum of the fractional interest in the sulphur in said tract delivered by First Party to Second Party, plus the fractional interests therein acquired by Second Party, expressed in decimals, shall be multiplied by the sum of such fractional interests expressed in cents, and the result shall be the number of cents per long ton in sulphur to be paid by Second Party to First Party as an overriding royalty on the sulphur produced and saved from such tract. In other words, if First Party delivers to Second Party a fifty per cent. interest in the sulphur in a specific tract and Second Party acquires no additional interest, the overriding royalty to be paid to First Party shall be .50 x 50c or 25c. In case Second Party acquires an additional twenty per cent. interest in the sulphur, the overriding royalty to be paid to First Party shall be .70 x 70c or 49c and so on for all other fractional interests. It is further agreed, however, that the total royalty to be paid by Second Party on the sulphur produced from any particular tract of land and based on the full one hundred per cent. mineral interest therein shall never exceed Two Dollars ($2.00) per long ton, including the land owner's royalty as well as the overriding royalty which First Party is entitled to and including any other royalties or overriding royalties which may have to be paid thereon, except that in case Second Party should elect to pay royalties and overriding royalties in excess of Two Dollars ($2.00) per long ton on sulphur produced from any particular lease, First Party's overriding royalty interest shall not be reduced below the amount he would otherwise be entitled to on the interest actually delivered by First Party to Second Party. In case First Party secures leases covering any particular tract of land providing

for a total royalty to the lessors in excess of One Dollar ($1.00) per long ton of sulphur based on one hundred per cent. ownership, such amount of royalty in excess of One Dollar ($1.00) per long ton shall be deducted from the overriding royalty First Party is entitled to on the sulphur produced from said tract."

We construe that paragraph to mean this: Should the Duval Company, either through the efforts of Dunn, or through its own efforts, or through the joint efforts of both of them, acquire a lease on a full 100 per cent. of the sulphur interest in a given tract under which the royalty to be paid to the lessors should not exceed $1.00 per gross ton on sulphur produced therefrom, then Dunn's royalty should be $1.00 per gross ton on all such sulphur. But should Dunn secure a lease on any particular tract providing for the payment of a total royalty to the lessors in excess of $1.00 per long ton of sulphur, then the amount in excess of $1.00 royalty to be paid to the lessor should be deducted from the $1.00 royalty which otherwise would be payable to Dunn. It appears that in some of the tracts there was a divided ownership of the sulphur rights, and that some of the leases assigned by Dunn to the Duval Company covered fractional interests in the sulphur rights. As to such leases the contract provided that, in case the interest in any specific tract assigned by Dunn to the Duval Company, plus the interest acquired by the said company, should be less than 100 per cent. of the sulphur rights, then the royalty which should be payable to Dunn was not to be reduced in the proportion that the interest acquired by the Duval Company bore to the whole, but should be arrived at by a formula specifically set out, which, in substance and effect, was by squaring the interest expressed in decimals and expressing the results in terms of cents. That portion of the contract is made plain by the specific examples set out therein. The only difficulty in construing this paragraph arises when we come to consider this provision: "* * except that in case of Second Party should elect to pay royalties and overriding royalties in excess of Two Dollars ($2.00) per long ton * * *" etc. This provision can best be understood when considered in connection with the letter and amendment set out below.

On January 20, 1933, Dunn wrote a letter to the Duval Company, the body of which was as follows:

"On December 22, 1932, an agreement was entered into between your company and L. H. Dunn with reference to certain sulphur and mineral leases in Wharton County, Texas, to use his best efforts to secure additional leases covering fully described therein, in which the said L. H. Dunn agreed lands in the same area and covering outstanding interests which had previously been secured.

"L. H. Dunn has been unable to secure the additional leases and additional interests, and you are hereby authorized to proceed, as you may see fit, to secure these leases and outstanding interests through the efforts of your company or its agents; and in securing such additional leases and interests we hereby authorize you, in accordance with the provisions of said contract, to utilize, if in your judgment it becomes necessary in securing any such lease or interest, all or any part of any overriding royalties which we would be entitled to under said contract on any particular tract of land except such overriding royalties as we are already entitled to on the interest delivered to you by L. H. Dunn. In other words, if it becomes necessary, in your judgment, in securing a lease or mineral interest, that you increase the amount of royalty payable thereunder to such an extent as to entirely eliminate any overriding royalty which we would be entitled to on any such tract of land, by reason of the above described contract, you are hereby authorized to do so and we hereby release you from any claim or damage therefor."

Thereafter, on May 20, 1933, Paragraph 4(d) above copied was amended as follows:

"Second Party has already made contracts with owners of mineral interests in the contract area which provides for royalties in excess of the said Two Dollars ($2.00) per long ton, and First Party ratifies and confirms the action of said Second Party in agreeing to such excess royalty payments, and First Party agrees that in securing additional leases and mineral interests, Second Party is authorized to utilize, if in its judgment it becomes necessary in securing any such lease or interest, all or any part of any overriding royalties which First Party would be entitled to under this contract on any particular tract of land except such overriding royalties as First Party is already entitled to on the interests delivered by First Party to Second Party. First Party specifically takes notice of the fact that

Second Party has agreed to pay Texas Gulf Sulphur Company and certain other interests more than the minimum of Two Dollars ($2.00) per long ton royalty, and First Party agrees that he is not entitled to any overriding royalty on any of such interests or that might otherwise accrue to him under the terms and provision hereof by reason of the securing of such interests by Second Party."

We are called upon by the certificate to construe the amended contract "in reference to those instances in which appellee Duval Texas Sulphur Company paid to the owners of the sulphur interest more than the minimum royalty of $2.00 per long ton."

According to the tenative opinion of the Court of Civil Appeals accompanying this certificate, and according to our understanding of the briefs, Dunn and his associates take the position that the contract, as amended, should be construed with reference to the question under review as follows:

"Appellants' contention as to the true consrtuction on the overriding royalty agreement, after its modification, can be made clear by illustration. In a case where Dunn had acquired 50% of the sulphur rights in a tract, and was unable to acquire more, he was entitled by the formula to 50c x 50%, or 25c (i.e., the square of the fractional interest). It is his contention that the true meaning of the modified agreement of May 20, 1933, is that, where the Duval Company acquired the remaining outstanding 50% sulphur rights in such tract, and paid a landowner's royalty therefor in excess of $2.00, he would then be entitled to an overriding royalty of 50c per long ton, instead of 25c. In other words, after the full interest had been acquired, it is his contention that he was entitled to an overriding royalty which should be equal in cents to the percentage of the sulphur rights he had delivered to the Duval Company out of such tract. * * *."

1 With this construction we are unable to agree. We find no provision in the contract under which the royalty per gross ton to be paid to Dunn should, under any state of facts, be equal in cents to the percentage of the sulphur rights delivered. There is a provision for the payment of $1.00 per gross ton on a lease covering a full 100 per cent. sulphur interest, provided the total royalty obligations do not exceed $2.00. There

is also a provision for reducing the amount of overriding royalty which Dunn would otherwise be entitled to by the amount in excess of $1.00 per gross ton which Dunn might obligate the Duval Company to pay lessor as royalty. Admittedly neither of those provisions is applicable here. The only other method of calculating the royalty to which Dunn might be entitled is that above referred to wherein the formula is applicable. We are well convinced that the purpose of the letter and amendment was to make clear that the formula should be applied in the fact situation under review. It appears that a condition had developed which rendered it impossible for Dunn to procure any more leases under the terms of his contract. The Company had the right to obligate itself to pay any amount of royalty which it might choose in excess of $2.00 per gross ton. Obviously it did not elect to do so if thereby it obligated itself to pay Dunn additional royalty. On the other hand it had no right to reduce the amount which would otherwise be owing to Dunn by obligating itself to pay lessors royalty in excess of $2.00 per gross ton. Dunn had nothing to lose by consenting for the company to proceed to procure leases with excessive royalty obligations, for had the Company not elected to do so, the amount of royalty owing to Dunn on the leases of fractional interests which he had assigned to the Company would have been measured by the formula. At the time the letter was written the royalty which Dunn was "already entitled to on the interests delivered" was that arrived at by the application of the formula, and it seems to us that the purpose of the letter and amendment was to make certain that the Company by electing to pay excess royalties to lessors, assumed no additional obligations to Dunn, and that Dunn forfeited no existing right on that account. Dunn's right then was to be paid according to the formula, and that is the right which was recognized and preserved. Our conclusion is that, as to those leases assigned by Dunn to the Duval Company covering fractional interests only in the sulphur rights in named tracts, the royalty owing to Dunn is that arrived at by the application of the formula set out in the contract, if to procure leases on the remainder of the sulphur interests in such tracts the Duval Company paid a total royalty in excess of $2.00 per gross ton.

The foregoing is certified as our answer to the first question in the certificate. It accords with the views expressed in the tentative opinion accompanying the certificate.

**2** The second question is as follows:

"Under the facts stated upon that feature, did the evidence raise a question of fact, either (1) over a failure of the minds of the parties to meet as to the true meaning of the final contracts through a mutual mistake, or (2) as a result of any misleading of appellants by Zoffman as to such meaning?"

We presume that the question relates to the facts stated in the tentative opinion, for we find no facts with reference to the matter to which the question relates stated in the certificate. It will be noted that the question does not call upon us to determine whether the facts, as reflected by the entire record, present an issue of fact with regard to mutual mistake or fraud, but only to answer whether or not the facts "stated upon that feature" raised such question. We have therefore not considered the statement of facts. Answering the questions as restricted, we merely state that we find no facts stated upon that feature which raised a question of fact, either as to mutual mistake or as to any misleading of appellants. On the contrary, the stated facts reflect dealings at arms' lengths.

Opinion adopted by the Supreme Court June 4, 1941.

Rehearing overruled July 9, 1941.